UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| JOSEPH F. GELBAND, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil No. 09-128-P-H |
| | ) |
| OFFICER DANNY HONDO, et al., | ) |
| | ) |
| Defendants | ) |

**RECOMMENDED DECISION ON FOUR MOTIONS FOR SUMMARY JUDGMENT**

This action is brought in response to a November 27, 2007, incident at Joseph Gelband's residence.  Gelband alleges that he and two of his "longtime friends sustained head wounds" during, what he describes as, a fracas.  Gelband explains that a disturbance broke out involving Gelband, and his two friends, Jillian Hilton, and Megan Bates.  With respect to the uncontested head wounds sustained by Hilton and Bates -- both of whom required numerous stitches -- Gelband claims that he was defending himself.  Gelband was indicted on two counts of aggravated assault and these charges were eventually dismissed.  This dismissal was, at least partially, because Hilton and Bates refused to cooperate with the prosecution after their grand jury testimony.

This recommended decision addresses four motions for summary judgment.  Three are pressed by individual Portland Police Officers -- Danny Hondo (Doc. No. 49), Jeffrey Tully (Doc. No. 50) and Charlie Frazier (Doc. No. 51) -- and the fourth is a motion by Gelband seeking partial summary judgment against Officers Hondo and Tully (Doc. No. 66).  Gelband filed a responsive statement of fact to the joint statement of fact submitted by Officers Hondo, Tully, and Frazier, but he did not file a memorandum opposing those motions.  The defendants suggest that this constitutes a waiver of Gelband's opposition to their dispositive motions, but the docket

reflects, despite this pleading shortfall, that Gelband does contest their summary judgment requests. Gelband has filed a surreply addressing his failure to file the memorandum and I take the substantive arguments made therein as his response to the defendants' motions. I now recommend the Court grant the officers' motions for summary judgment, terminating plaintiff's cross motion.

## DISCUSSION

### *Summary Judgment*

Any one of these movants is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that [as] the movant [he] is entitled to judgment as a matter of law." Fed. R. Civ. P.56(c)(2). The "facts are taken in the light most favorable to" the non-movant and all inferences are drawn in his favor. Agusty-Reyes v. The Dept. of Educ. of Puerto Rico, __ F. 3d, __, __, 2010 WL 1293906, 1- 2 (1st Cir. Apr. 6, 2010).

### *Parameters of Gelband's Action*

In a previous recommendation on motions to dismiss I observed that Gelband focused on his contention that the arresting officers lacked probable cause for his arrest, honing in on his assertion that the police disregarded evidence, including his bleeding head wound, and "all sorts of exculpatory evidence." In that decision I explained:

> Both sets of defendants in their motions to dismiss do their best to fairly construe the claims against them in Gelband's amended complaint. In his responsive memorandum Gelband unequivocally withdraws any claims under 42 U.S.C. § 1985 or § 1986. (Resp. Mots. Dismiss at 5.) He defends only his 42 U.S.C § 1983 claim…. (Id. at 2-4.) With respect to the theory of liability he focuses solely on a Fourth Amendment claim stating: "Plaintiff brought suit under 42 U.S.C. Section 1983 to vindicate his right to be free from unreasonable searches and seizures as guaranteed by the Fourth Amendment. It is respectfully submitted that the Amended Complaint herein alleges and sets forth, with sufficient detail, numerous violations of those Fourth Amendment protections."

2

> (Id. at 2.) Gelband focuses on his contention that the arresting officers lacked
> probable cause for his arrest, honing in on his assertion that the police disregarded
> evidence, including his bleeding head wound, and "all sorts of exculpatory
> evidence." (Id. at 2-3.) He flatly disowns any claims of malicious prosecution or
> substantive due process. (Id.)

Gelband v. Hondo.  Civ. No. 09-128-H, 2009 WL 1686832, 1 (D. Me. June 16, 2009) (footnote

omitted).  I noted that "in his surreply Gelband does not change his theory of liability set forth in

his responsive motion.  (Surreply at 1-2.)."  Id at 1 n.3.  In his objection to the recommended

decision Gelband stressed that his "Fourth Amendment allegations of illegal search and seizure

are the most appropriate Section 1983 claims imaginable."  (Obj. Rec. Dec. at 6, Doc. No. 25.)

He did not object to my reasoning limiting his claim to a Fourth Amendment theory of arrest

without probable cause.

In his surreply to the defendants' summary judgment motions Gelband does not challenge

the limitation of his claims against these defendants to a Fourth Amendment unlawful arrest

challenge.  Indeed, his own motion for partial summary judgment against Hondo and Tully rests

entirely on this theory.  Gelband cannot now defend constitutional claims beyond his Fourth

Amendment right not to be seized without probable cause.[1]

### Fourth Amendment Arrest without Probable Cause Standard

The Fourth Amendment conditions the arrest and seizure of a person on the existence of a

warrant or probable cause to believe that an offense is being, or has been, committed.  Alexis v.

McDonald's Rest. Of Mass., Inc., 67 F.3d 341, 349 (1st Cir. 1995).  Probable cause exists if the

facts and circumstances within an officer's knowledge and of which the officer has reasonably

trustworthy information are sufficient to lead a person of reasonable caution to formulate a belief

---

[1]    In  opposing the motion for summary judgment filed by Assistant District Attorney Tice, Gelband did
attempt to revive/generate other theories of recovery and I address his inability to do so in my recommended
decision on that motion.

that a crime is being committed.  Id.  (paraphrasing Carroll v. United States, 267 U.S. 132, 162 (1925)).  "The constitutionality of a warrantless arrest 'depends . . . upon whether, at the moment the arrest was made, the officer[] had probable cause to make it.'"  Logue v. Dore, 103 F.3d 1040, 1044 (1st Cir. 1997) (quoting Beck v. Ohio, 379 U.S. 89, 91 (1964)).  "[T]hough probable cause requires more than mere suspicion, it does not require the same quantum of proof as is needed to convict."  Id.  "Whether an officer is authorized to make an arrest ordinarily depends, in the first instance, on state law."  Michigan v. DeFillippo, 443 U.S. 31, 36 (1979).  See also Prokey v. Watkins, 942 F.2d 67, 73 (1st 1991) ("Whether . . . a reasonable policeman, on the basis of the information known to him, could have believed there was probable cause is a question of law, subject to resolution by the judge not the jury.  Nevertheless, if what the policeman knew prior to the arrest is genuinely in dispute, and if a reasonable officer's perception of probable cause would differ depending on the correct version, that factual dispute must be resolved by a fact finder.").  Gelband was charged under the following provision of Maine law: "A person is guilty of aggravated assault if he intentionally, knowingly, or recklessly cause … [b]odily injury to another with use of a dangerous weapon.  17-A M.R.S. § 208(1)(b).

**Facts**

The facts set forth below are a compilation of facts presented, in a joint statement, by the three officers and those advanced by Gelband in support of his motion for partial summary judgment. [2]

Joseph Gelband is an individual who resides in Apartment 1 at 540 Congress Street in Portland, Maine.  After attending Hunter College and New York Law School, he was admitted to practice law in New York.  (SMF ¶ 1; Resp. SMF ¶ 1.)  During the timeframe relevant to the

---

[2]    In many instances Gelband does not deny the statement of fact but asserts that they are immaterial.  I have treated the facts as admitted.  I assure Gelband that I have weighed those facts that have limited materiality appropriately low and have excluded those facts that are entirely immaterial from this recitation.

allegations in this case, Officers Daniel Hondo, Jeffrey Tully, and Charles Frazier were

employed by the Portland Police Department. (SMF ¶ 2; Resp. SMF ¶ 2.)[3]

**November 27, 2007**

There is no dispute as to the following.  Megan Bates telephoned Gelband at

approximately three o'clock in the morning of November 27, 2007.  (SMF ¶ 19; Resp. SMF

---

[3]     The following factual fodder forwarded by the defendants potentially may have been material to the
resolution of these dispositive motions but I have excluded them from consideration as part of my recommended
decision:

**Prior Arrest of Mr. Gelband (March 31, 2005)**
On March 31, 2005, Portland Police Department officers arrested Mr. Gelband in his
apartment at 540 Congress Street in Portland after investigating a female acquaintance's complaint
that he had threatened, beaten, and sexually assaulted her, as well as provided alcohol to her.
(SMF ¶ 6; Resp. SMF ¶ 6.)  A grand jury sitting in Cumberland County indicted Mr. Gelband for
his March 31, 2005, conduct.  (SMF ¶ 7; Resp. SMF ¶ 7.)  The complainant who prompted Mr.
Gelband's arrest on March 31, 2005, became uncooperative with the police, and the criminal
charges against him were ultimately dismissed.  (SMF ¶ 8; Resp. SMF ¶ 8; Gelband Dep. at 135,
136, 150, 155.)  The decision by the complainant in Mr. Gelband's March 31, 2005, arrest to
withdraw her cooperation with the police played a role in the dismissal of the case against him.
(SMF ¶ 9; Resp. SMF ¶ 9.)

**Mr. Gelband's Relationship with Ms. Bates & Ms. Hilton**
**(Prior to November 27, 2007)**
As of November 27, 2007, Mr. Gelband and Megan Bates  had been good friends for five
or six years.  (SMF ¶ 10; Resp. SMF ¶ 10.)  Jillian Hilton introduced Ms. Bates to Mr. Gelband
prior to November 27, 2007.  (SMF ¶ 11; Resp. SMF ¶ 11.)  Mr. Gelband and Ms. Hilton had
become friends prior to November 27, 2007.  (SMF ¶ 12; Resp. SMF ¶ 12.)

**Portland PD's Investigation of Prior Allegations of an Altercation Involving Mr.**
**Gelband, Ms. Bates & Ms. Hilton (May 20, 2007)**
On May 20, 2007, Mr. Gelband telephoned the Portland Police Department and reported
that Ms. Hilton and Ms. Bates were refusing to leave his apartment at 540 Congress Street.  (SMF
¶ 13; Resp. SMF ¶ 13.)  According to the defendants, when making the report to the Portland
Police Department on May 20, 2007, concerning Ms. Bates' and Ms. Hilton's refusal to leave, Mr.
Gelband informed the call taker that 'they' were accusing Mr. Gelband of having raped them.
(SMF ¶ 14; Gelband Dep. Ex. P-4 at 1.)  Less than two minutes after Mr. Gelband contacted the
Portland Police Department on May 20, 2007, Ms. Hilton also telephoned the Police Department
and reported that Mr. Gelband had hit her and Ms. Bates with his hands.  (SMF ¶ 15; Gelband
Dep. Ex. P-4 at 1.)  During Ms. Hilton's telephone contact with the Portland Police Department on
May 20, 2007, Mr. Gelband could be heard yelling in the background.  (SMF ¶ 16; Gelband Dep.
Ex. P-4 at 1.)  Portland Police officers responded to Mr. Gelband's apartment at 540 Congress
Street on May 20, 2007, and arrived less than five minutes from the time of Mr. Gelband's call.
(SMF ¶ 14; Gelband Dep. Ex. P-4 at 1-2.)  Ms. Hilton and Ms. Bates left Mr. Gelband's apartment
after the police officers arrived at Mr. Gelband's apartment on May 20, 2007.  (SMF ¶ 18;
Gelband Dep. Ex. P-4 at 1.)

In response to this description of this incident, Gelband points out that early in the
deposition he attempted to explain that there was a "grievous error" in the report of what he told
the dispatcher.  (Resp. SMF ¶ 14; Gelband Dep. at 18:17-25.)  He also directs the court's attention
to the resolution of the May 20 "refusal to leave" incident: "TWO FEMALES HAVE LEFT AND
WARNED NOT TO RETURN."  (Resp. SMF ¶¶ 15-18.)

¶ 19.)  Bates informed Gelband during this telephone conversation that her apartment was flooded.  (SMF ¶ 20; Resp. SMF ¶ 20.)  Bates inquired as to whether he would allow her to stay overnight at his apartment, and he agreed to her request. (SMF ¶ 21; Resp. SMF ¶ 21.)  Bates proceeded to Gelband's apartment.  (SMF ¶ 22; Resp. SMF ¶ 22.)  Jillian Hilton and Bates arrived at Gelband's apartment during the early morning hours on November 27, 2007. (SMF ¶ 23; Resp. SMF ¶ 23.)[4]  After Hilton and Bates arrived at Gelband's apartment he chatted with them as they consumed cocktails.  (SMF ¶ 25; Resp. SMF ¶ 25.)

An altercation occurred while Bates and Hilton were at Gelband's residence which resulted in injuries to all three individuals.  (SMF ¶ 26; Resp. SMF ¶ 26.)  According to the defendants, Gelband hit Hilton in the head with a telephone instrument.  (SMF ¶ 27.)  Hilton fell back or stepped back after Gelband hit her with the telephone receiver.  (SMF ¶ 28.)  Gelband is right-handed and hit Hilton with the telephone instrument in his right hand.  (SMF ¶ 29.) Gelband injured Hilton when he hit her with the telephone receiver.  (SMF ¶ 30.)  Hilton hit Gelband in the head with a television remote control device and injured him.  (SMF ¶¶ 32, 33.)[5]

Bates "rushed at" Gelband after he hit Hilton with the telephone receiver.  (SMF ¶ 34; Resp. SMF ¶ 34; Gelband Dep. at 41:9-20.)  Gelband hit Bates on the forehead twice with a telephone receiver that he held in his right hand and injured her.  (SMF ¶¶ 35, 36; Resp. SMF ¶¶ 35, 36.)  Gelband was responsible for the injuries sustained by Bates.  (SMF ¶¶ 37, 38; Resp. SMF ¶¶  37, 38.)  Bates may have scratched one of  Gelband's arms after he hit Hilton with the telephone receiver.  (SMF ¶ 39; Resp. SMF ¶ 39.)  Bates did not cause Gelband any serious

---

[4]        The photograph marked as Exhibit P-9 depicts Hilton as she looked on November 27, 2007, prior to the altercation with Gelband.  (SMF ¶ 24; Resp. SMF ¶ 24; Gelband Dep. Ex. P-9.)
[5]        Gelband responds to Paragraphs 27 through 33 by insisting he acted in self-defense.  (Resp. SMF ¶¶ 27-33.)  He cites to page 168 of his affidavit in which he is questioned: "It is your contention that the only reason you struck Jillian Hilton and Megan Bates was because you were acting in self-defense."  (Gelband Dep. at 168.) Gelband answered:  "That is my precise contention."   (Id.)

injury when she scratched him.  (SMF ¶ 40; Resp. SMF ¶ 40.)  Bates and Hilton ran from

Gelband's apartment into the hallway after he hit them.  (SMF ¶ 41; Resp. SMF ¶ 41.)

**The Portland Police Response**

A resident of 540 Congress Street in Portland telephoned the Portland Police Department

on November 27, 2007, and reported that he was hearing what sounded like a domestic violence

assault in progress, indicating that he feared that a serious injury may result.  (SMF ¶ 42; Resp.

SMF ¶ 42.)  A Portland Police Department dispatcher assigned Officers Hondo and Tully to

investigate the report of an assault in progress in Apartment 1 at 540 Congress Street.  (SMF ¶

43; Resp. SMF ¶ 43; Pl.'s SMF ¶ 1; Defs.' Resp. SMF ¶ 1.)  Officers Hondo and Tully arrived at

540 Congress Street at approximately 5:40 AM, Tully arriving first.  (SMF ¶ 44; Resp. SMF ¶

44; Pl.'s SMF ¶¶ 2, 3; Defs.' Resp. SMF ¶ 2, 3.) Upon their arrival, Officers Hondo and Tully

met with the complainant-resident inside the building.  (SMF ¶ 45; Resp. SMF ¶ 45.)  The

resident-complainant told Officers Hondo and Tully that he had heard a commotion that sounded

like a male fighting with some females, which led the resident-complainant to conclude that

there was a domestic assault in progress.  (SMF ¶ 46; Resp. SMF ¶ 46.)  The resident-

complainant told Officers Hondo and Tully that two females were bleeding and crying at the end

of the upstairs hallway.  (SMF ¶ 47; Resp. SMF ¶ 47.)

Officers Hondo and Tully approached two women, who were ultimately identified as

Bates and Hilton, in the upstairs hallway.  (SMF ¶ 48; Resp. SMF ¶ 48; Pl.'s SMF ¶ 4; Defs.'

Resp. SMF ¶ 4.)  Officer Hondo observed blood spatter on the walls in the hallway.  (SMF ¶ 49;

Resp. SMF ¶ 49.)[6]  Bates and Hilton were crying hysterically, they were bleeding from the head,

and they had blood on their hands, clothing, head and face.  (SMF ¶ 50; Resp. SMF ¶ 50; Pl.'s

---

[6]     Gelband does not want the fact that there were blood spatters in the hallway to be taken as an indication
that any violence occurred in the hallway.  (Resp. SMF ¶ 49.)  As he points out, this is not being alleged by any
victim or witnesses.

SMF ¶ 4; Defs.' Resp. SMF ¶ 4.)  Bates and Hilton told Officers Hondo and Tully that Gelband had assaulted them in his apartment with a telephone, which amounted to an aggravated assault complaint.  (SMF ¶ 51; Resp. SMF ¶ 51; Pl.'s SMF ¶ 5; Defs.' Resp. SMF ¶ 5.)  Officer Hondo considered the injuries to Bates and Hilton to be severe in the context of the aggravated assault investigation.  (SMF ¶ 52; Resp. SMF ¶ 52) (emphasis added).

For his part, Gelband saw flashing blue lights in front of his building after Bates and Hilton ran into the hallway of his apartment building.  (SMF ¶ 53; Resp. SMF ¶ 53.)  When Gelband saw the flashing blue lights, he concluded that Bates and/or Hilton had called the police because they had been involved in 'a somewhat-violent incident' in his apartment.  (SMF ¶ 54; Resp. SMF ¶ 54.)  Gelband went into the hallway to meet the police.  (SMF ¶ 55; Resp. SMF ¶ 55; Pl.'s SMF ¶ 6; Defs.' Resp. SMF ¶ 6.)  Gelband walked by a mirror in the hallway of his apartment when going to the door leading into the building's hallway.  (SMF ¶ 37; Resp. SMF ¶ 37.)[7]  As he left his apartment Gelband encountered two police officers in the hallway outside his apartment door.  (SMF ¶ 57; Resp. SMF ¶ 57.)  After entering the hallway Gelband saw Officer Tully talking to Hilton and Bates in the hallway.  (SMF ¶ 58; Resp. SMF ¶ 58.)  Bates and Hilton identified him to Officers Hondo and Tully as the individual who had assaulted them with a telephone handset.  (SMF ¶ 59; Resp. SMF ¶ 59; Pl.'s SMF ¶ 7; Defs.' Resp. SMF ¶ 7.)

Officer Hondo approached Gelband at the head of the stairway leading up to the hallway.  (SMF ¶ 60; Resp. SMF ¶ 60.)  Officer Tully interviewed Bates and Hilton while Officer Hondo interviewed Gelband, a separation of responsibilities that is standard police procedure.  (SMF ¶ 61; Hondo Dep. at 23:4-6, 30:4-19, 36:20-22; Tully Dep. at 61:7-10.)[8]  Bates and Hilton told

---

[7]      Gelband testified that he was not sure whether or not he saw himself in the mirror. (Gelband Dep. at 52-53.)

[8]      Gelband asks the court not to assume that 'interview' means "something more than a single non-specific question vaguely answered."  (Resp. SMF ¶ 61.)

Officer Tully that Gelband had attacked each of them with a telephone.  (SMF ¶ 62; Resp. SMF ¶ 62.)  Officer Tully was standing approximately 25 feet from Gelband with Bates and Hilton when they identified Gelband and Hondo believes that Tully would have seen Gelband's face.  (Pl.'s SMF ¶ 17; Hondo Dep. at 27-28, 54; Defs.' Resp. SMF ¶ 17.)  Tully testified that he did not recall ever getting a good look at Gelband that evening (Pl.'s SMF ¶ 18; Tully Dep. at 26; Defs.' Resp. SMF ¶ 18), and he did not observe Gelband's injuries (Pl.'s SMF ¶ 19; Tully Dep. at 27; Defs.' Resp. SMF ¶ 19), but allowed that it was possible that he did see the injuries (Pl.'s SMF ¶ 20; Defs.' Resp. SMF ¶¶ 19, 20; Tully Dep. at 44).

After identifying Gelband as their assailant, Bates and Hilton advised the officers that they would give written statements and press charges against Gelband.  (SMF ¶ 63; Resp. SMF ¶ 63.)  Officer Tully requested that an ambulance respond to the scene in order to evaluate the injuries sustained by Bates and Hilton; they were ultimately transported from 540 Congress Street to Maine Medical Center.  (SMF ¶ 64; Resp. SMF ¶ 64.)[9]

**Officer Hondo's Interview of Gelband**

Officer Hondo talked with Gelband in the hallway in front of his apartment doorway after Gelband emerged from his apartment.  (SMF ¶ 66; Resp. SMF ¶ 66.)  Officer Hondo was in uniform during this meeting with Gelband.  (SMF ¶ 67; Resp. SMF ¶ 67.)  Officer Hondo did not display a weapon when talking with Gelband (SMF ¶ 68; Resp. SMF ¶ 68) and Gelband was not handcuffed (SMF ¶ 69; Resp. SMF ¶ 69).  Officer Hondo initially stood beside Gelband during the interview, but he asked Gelband to sit down in the hallway while the officers figured out

---

[9]  After Gelband's arrest, Officer Tully obtained a written statement from Bates at Maine Medical Center, which provided additional details regarding Gelband's assault on her and the surrounding circumstances.  (SMF ¶ 65; Tully Dep. at 61:4-6; Gelband Dep. Ex. State-2.)  Gelband insists that Bates could not possibly give details regarding an assault upon her that never occurred and he cites his own deposition testimony that it was Bates who first made physical contact with him.  (Resp. SMF ¶ 65; Gelband Dep. at 41:14-42:2.)  This response does not counter the fact that Bates did make the written statement cited by the defendants.  However, the statements made after the arrest are not material to the pre-arrest probable cause determination.

what happened.  (SMF ¶ 70; Resp. SMF ¶ 70; Pl.'s SMF ¶ 9; Defs.' Resp. SMF ¶ 9.)  Gelband

sat on the hallway floor when talking with Officer Hondo and while Officer Tully talked with

Bates and Hilton further down the hallway.  (SMF ¶ 71; Resp. SMF ¶ 71; Pl.'s SMF ¶ 9; Defs.'

Resp. SMF ¶ 9.)  Officer Hondo explained to Gelband that the officers were investigating a

complaint of domestic violence.  (SMF ¶ 72; Resp. SMF ¶ 72.)  At this juncture Gelband knew

that the police officers were investigating the violence that had occurred in his apartment.  (SMF

¶ 73; Resp. SMF ¶ 73.)

When meeting with Officer Hondo in the hallway Gelband could see that Officer Tully

was talking with Bates and Hilton.  (SMF ¶ 74; Resp. SMF ¶ 74.)  At the time of his interview,

Gelband believed that Bates and Hilton were discussing their versions of what happened with

Officer Tully.  (SMF ¶ 75; Resp. SMF ¶ 75.)  By this time Gelband knew that Bates and Hilton

had been injured in the altercation and believed that Bates and Hilton were discussing their

injuries with Officer Tully.  (SMF ¶¶ 76, 77; Resp. SMF ¶¶ 76, 77.)  Gelband knew that the two

women were 'extremely upset about having been hit.'  (SMF ¶ 78; Resp. SMF ¶ 78.)  He knew

that Hilton was hysterical.  (SMF ¶ 79; Resp. SMF ¶ 79.)  Gelband also knew that Bates was

hysterical when she was meeting with the police in the hallway.  (SMF ¶ 80; Resp. SMF ¶ 80.)[10]

Officer Hondo was polite and treated Gelband 'very decently' during his interview in the

hallway.  (SMF ¶ 102; Resp. SMF ¶ 102.)  He was professional, courteous and respectful.  (SMF

¶ 103; Resp. SMF ¶ 103.)  Hondo was not accusatory during this interview.  (SMF ¶ 104; Resp.

SMF ¶ 104.)

When talking with Officer Hondo in the hallway of his apartment building Gelband was

calm and cooperative.  (SMF ¶ 81; Resp. SMF ¶ 81.)  According to the defendants, Gelband was

---

[10]     Officer Hondo testified that from a distance of approximately 25 feet he observed the alleged victims
bleeding. (Pl.'s SMF ¶ 10; Defs.' Resp. SMF ¶ 10.)

relaxed, focused, responsive, and oriented to time and place when talking.  (SMF ¶ 82; Hondo

Dep. at 29:8-22.)  Gelband was smoking a cigarette and asked Hondo if he wanted it put out, to

which Hondo replied that he did not mind if Gelband smoked.  (Pl.'s SMF ¶ 8; Defs.' Resp. SMF

¶ 8; SMF ¶ 82.)  Gelband responds that (at this point)  he "was stunned."  (Resp. SMF ¶ 82;

Gelband Dep. at 51.)  He points out that Hondo testified that he stood about three to five feet

away from Gelband but did not notice he was bleeding from his head, an indication to Gelband

that Hondo was not paying attention to details.  (Resp. SMF ¶ 82; Hondo Dep. at 26, 29; Pl.'s

SMF ¶¶ 11, 12.)[11]  Gelband was concerned because he believed that he had injured Bates and

Hilton.  (SMF ¶¶ 83, 84; Resp. SMF ¶ 83, 84.)  Gelband asked Officer Hondo whether Bates and

Hilton were okay.  (SMF ¶¶ 85; Resp. SMF ¶ 85.)

 According to the defendants, Officer Hondo has a practice of asking suspects to explain

what happened and most suspects have given him an explanation.  (SMF ¶ 86; Hondo Depo. at

34:3-12; 50:14- 52:11.)[12]  There is no dispute that Hondo asked Gelband, 'What happened?'

(SMF ¶¶ 87; Resp. SMF ¶ 87; Pl.'s SMF ¶ 25; Defs.' Resp. ¶ 25.)  When Officer Hondo asked

for this explanation, Gelband knew that Hondo was giving him an opportunity to give his version

of what had happened with Bates and Hilton.  (SMF ¶ 88; Resp. SMF ¶ 88.)  In response to

Officer Hondo's question about what had happened, Gelband responded, 'I'm not sure, I may

have hurt the girls.' (SMF ¶ 89; Resp. SMF ¶ 89; Pl.'s SMF ¶ 26; Defs.' Resp. ¶ 26.)  At this

juncture,  Gelband was aware that he had been hit in the head.  (SMF ¶ 96; Resp. SMF ¶ 96.)

Gelband did not tell Officer Hondo that Hilton or Bates had attacked him or injured him.  (SMF

---

[11] Officer Hondo testified both that he did not notice plaintiff was bleeding from his head and that he did not recall whether the plaintiff was bleeding.  (Defs.' Resp. SMF ¶¶ 11, 12; Hondo Dep. at 29, 48-49.)

[12] Gelband retorts that the percentage of suspects who answer Hondo's generic question is immaterial to this case as it has no bearing on whether or not it was reasonable in this case to consider his investigation complete, especially because Gelband had a head injury.  (Resp. SMF ¶ 86.)

¶¶ 97, 98, 99, 100; Resp. SMF ¶ 97, 98, 99, 100.)  He did not say that he had hit Bates in self

defense.  (SMF ¶ 101; Resp. SMF ¶ 101.)

    Hondo testified that he did not believe that answers given by Gelband called for a follow-

up because he did not prevent Gelband from answering his question about what happened.

(Hondo Dep. at 56 Pl.'s SMF ¶ 26; Defs.' Resp. ¶ 26.)  In his view, he gave Gelband an

opportunity to tell him that he had acted in self-defense (SMF ¶ 92; Resp. SMF ¶ 92; Hondo

Dep. at 33:9-13; Gelband Dep. at 56-57) and Gelband did not tell Officer Hondo during his

interview that he had hit Hilton in self defense (SMF ¶ 93; Resp. SMF ¶ 93).  According to

Gelband,  Hondo testified that it is his practice when arriving at the scene of a brawl to ask

everybody, including bystanders what happened so as to give everybody a fair opportunity to say

what they saw and what they didn't see.  (Pl.'s SMF ¶ 28; Hondo Dep. at 50-51.)  Officer Hondo

testified that once he has asked everybody what happened he does not ask follow-up questions.

(Pl.'s SMF ¶ 29; Hondo Dep. at 50-51.)  The defendants respond that in effect it was Hondo's

testimony that he sometimes questioned bystanders to a street brawl, and in doing so gives them

a fair opportunity to say what they saw and did not see.  (Defs.' Resp. SMF ¶ 28; Hondo Dep. at

50-51.)  He elaborated that brawls are a hard situation and it depends what is going on around

him and the situation at the time.  (Defs.' Resp. SMF ¶ 29; Hondo Dep. at 51.)

    Portland Police Officer Mark Keller photographed Gelband, Hilton, and Bates on the

scene at 540 Congress Street.  (SMF ¶ 105; Resp. SMF ¶ 105.)  Officer Keller took all of the

photographs identified as defense exhibits at the deposition of Gelband.  (SMF ¶ 106; Resp. SMF

¶ 106.)  There is no dispute that these photographs document the injuries that both Hilton and

Bates sustained and that Gelband was responsible for the depicted injuries, bleeding, and tears.[13]

---

[13]    The photograph identified as Exhibit O-13-4 is a photograph of Hilton taken by Officer Keller on
November 27, 2007, after Gelband hit her.  (SMF ¶ 107; Resp. SMF ¶ 107.)  The photograph identified as Exhibit

*Photographs of Mr. Gelband*

Officer Hondo does not recall whether Gelband was bleeding when he interviewed him, but Portland Police Officer Mark Keller also photographed Gelband after his arrest on November 27, 2007, in order to document his appearance.  (SMF ¶ 126; Resp. SMF ¶ 126.)   Gelband did not report to Officer Keller when he was being photographed that he had been injured by Bates and/or Hilton.  (SMF ¶ 127; Resp. SMF ¶ 127.)  Gelband was later photographed at the Cumberland County Jail (Pl.'s SMF ¶ 13; Defs.' Resp. SMF ¶ 13) and the photos showed injuries to Gelband's head and face and scratches on his hands.[14]  Upon review of those

O-13-4 accurately depicts injuries that Gelband caused when hitting Hilton. (SMF ¶ 108; Resp. SMF ¶ 108.)  The photograph identified as Exhibit O-13-4 shows Hilton crying.  (SMF ¶ 109; Resp. SMF ¶ 109.)  The photograph identified as Exhibit O-13-4 shows blood on Hilton's clothing.  (SMF ¶ 110; Resp. SMF ¶ 110.)  The photograph identified as Exhibit O-13-4 shows blood on Hilton's face.  (SMF ¶ 111; Resp. SMF ¶ 111.)  The photograph identified as Exhibit O-13-4 depicts the condition of Hilton about which Gelband was concerned.  (SMF ¶ 112; Resp. SMF ¶ 112.)  The photograph identified as Exhibit O-13-4 depicts the injuries sustained by Hilton about which Gelband was concerned.  (SMF ¶ 113; Resp. SMF ¶ 113)  The photograph identified as Exhibit O-13-5 was taken of Hilton on November 27, 2009, after Gelband hit her.  (SMF ¶ 114; Resp. SMF ¶ 114.)  The photograph identified as Exhibit O-13-5 accurately depicts injuries caused by Gelband when he hit Hilton.  (SMF ¶ 115; Resp. SMF ¶ 115.) The photograph identified as Exhibit O-13-5 accurately depicts blood on Hilton's face and hair in terms of how she appeared in the hallway of Gelband's apartment building.  (SMF ¶¶ 116, 117; Resp. SMF ¶¶ 116, 117.)  The photograph identified as Exhibit O-13-4 accurately depicts Hilton's physical appearance when Gelband was talking to Officer Hondo in the hallway.  (SMF ¶ 118; Resp. SMF ¶ 118.)  The photograph identified as Exhibit O-13-5 accurately depicts Hilton's physical appearance when Gelband was talking to Officer Hondo.  (SMF ¶ 119; Resp. SMF ¶ 119.)  If Officer Hondo had looked at Hilton while she was in the hallway he would have seen her as she is depicted in Exhibit O-13-4.  (SMF ¶ 121; Resp. SMF ¶ 121.)

The photograph identified as Exhibit **O-13-7** accurately depicts injuries caused by Gelband when he hit Bates.  (SMF ¶ 122; Resp. SMF ¶ 122.)  The photograph identified as Exhibit **O-13-8** accurately depicts injuries caused by Gelband when he hit Bates.  (SMF ¶ 123; Resp. SMF ¶ 123.)  The injuries to Bates that are depicted in Exhibit O-13-8 include a laceration to her head.  (SMF ¶ 124; Resp. SMF ¶ 124.)  The photograph identified as Exhibit O-13-7 reflects that Bates was crying when photographed on November 27, 2007.  (SMF ¶ 125; Resp. SMF ¶ 125.)

[14]    The photograph marked as Exhibit **O-13-36** accurately depicts Gelband as he appeared at the Cumberland County Jail on November 27, 2007, following his arrest.  (SMF ¶ 128; Resp. SMF ¶ 128.)  The photograph marked as Exhibit O-13-36 accurately depicts various injuries on Gelband's face following his arrest.  (SMF ¶ 129; Resp. SMF ¶ 129.)  The injuries on Gelband's  head that are visible in the photograph marked as Exhibit O-13-36 were caused by Hilton and Bates on November 27, 2007.  (SMF ¶ 130; Resp. SMF ¶ 130.)  The photograph marked as Exhibit **O-13-37** accurately depicts various injuries on Gelband's face, which was as he appeared at the Cumberland County Jail on November 27, 2007, following his arrest.  (SMF ¶ 131; Resp. SMF ¶ 31.)  The photograph marked as Exhibit **O-13-38** accurately depicts various scratches on Gelband's right hand, which was as he appeared at the Cumberland County Jail.  (SMF ¶ 132; Resp. SMF ¶ 132.)  The photograph marked as Exhibit O-13-38 accurately depicts some blood on Gelband's right hand.  (SMF ¶ 133; Resp. SMF ¶ 133.)  The photograph identified as Exhibit **O-13-39** depicts Gelband's left hand as it appeared after his arrest on November 27, 2007.  (SMF ¶ 134; Resp. SMF ¶ 134.)  The photograph identified as Exhibit O-13-39 depicts some blood or a scratch on the web spanning of Mr. Gelband's thumb and next finger on his left hand.  (SMF ¶ 135; Resp. SMF ¶ 135.)

photographs Hondo acknowledged and testified that Gelband had had visible head wounds at the time Hondo arrived at Gelband's apartment.  (Pl.'s SMF ¶ 14; Hondo Dep. 46-47.)[15]

Officer Hondo testified that Gelband's wounds were consistent with his having been struck with a television remote control (Pl.'s SMF ¶ 15;  Hondo Dep. at 60-64; Exs. O- 13-37, P-6, P-7 & P-8) in that the television remote control had curved lines and the injuries depicted in the photograph(s) of Gelband were curved (Defs.' Resp. SMF ¶ 15; Hondo Dep. at 60-64). He testified that blood dries and that it would be reasonable to believe that the photos of Gelband would have represented his injuries after the blood had at least dried somewhat.  (Hondo Dep. at 47; see also Pl.'s SMF ¶ 16; Defs.' Resp. SMF ¶ 16.)[16]

### Probable Cause Determination by Officers Tully & Hondo

Officer Hondo holds a bachelor's degree from the University of Maine at Farmington. (SMF ¶ 139; Resp. SMF ¶ 139.)  Officer Hondo has been employed as a Portland police officer since 2004.  (SMF ¶ 140; Resp. SMF ¶ 140.)  Officer Hondo completed an 18-week training program at the Maine Criminal Justice Academy ('MCJA') in 2004.  (SMF ¶ 141; Resp. SMF ¶ 141.)  The MCJA program included training in probable cause determinations and complaints about domestic violence.  (SMF ¶ 142; Resp. SMF ¶ 142.)  After completing his MCJA training, Officer Hondo successfully completed a 14-week field training program.  (SMF ¶ 143; Resp. SMF ¶ 143.)  Officer Hondo periodically received MCJA-approved in-service training in various subjects, including in probable cause determinations and domestic violence casework, since his completion of MCJA basic training.  (SMF ¶ 144; Resp. SMF ¶ 144.)  Officer Hondo is familiar

---

[15]      The defendants purport to qualify this statement by quoting the precise wording Hondo used at his testimony.  (Defs.' Resp. SMF ¶ 14; Hondo Dep. at 47.)

[16]      Police Officer Keller also photographed the hallway outside Gelband's apartment on November 27, 2007, after the altercation.  (SMF ¶ 136; Resp. SMF ¶ 136.)  The photograph marked as Exhibit **O-13-33** accurately shows a blood stain on the door to Apartment 3 in Gelband's apartment building, which is located down the hall from Gelband's apartment, as it appeared on November 27, 2007.  (SMF ¶ 137; Resp. SMF ¶ 137.)  The photograph marked as Exhibit **O-13-34** accurately shows a blood stain on the door to Apartment 3.  (SMF ¶ 138; Resp. SMF ¶ 138.)

with defensive wounds, which are caused to a person who is defending himself during an assault

or attack, and that defensive maneuvers may also cause injuries to the assailant.  (SMF ¶ 145;

Resp. SMF ¶ 145.)

Officer Tully was awarded a bachelor's degree from the University of Massachusetts at

Amherst in 2002.  (SMF ¶ 146; Resp. SMF ¶ 146.)  Officer Tully has been employed as a

Portland police officer since 2003.  (SMF ¶ 147; Resp. SMF ¶ 147.)  Tully completed basic

training at the MCJA in 2003.  (SMF ¶ 148; Resp. SMF ¶ 148.)  Officer Tully's MCJA-approved

training included Fourth Amendment requirements.  (SMF ¶ 149; Resp. SMF ¶ 149.)  He had

handled domestic violence cases prior to November 27, 2007.  (SMF ¶ 150; Resp. SMF ¶ 150.)

### Pre-Arrest Conference between Officers Tully and Hondo

 Officer Hondo understood that he had an obligation to assess the totality of

circumstances when determining whether probable cause existed for an arrest, including a

consideration of any exculpatory evidence.  (SMF ¶ 155; Resp. SMF ¶ 155; Pl.'s SMF ¶¶ 34, 35;

Defs.' Resp. SMF ¶¶ 34, 35.)  He understands that '[p]robable cause exists when the facts and

circumstances within the police officer's knowledge, and of which they had reasonably

trustworthy information, were sufficient to warrant a prudent person in believing that the

defendant had committed or was committing an offense.'  (SMF ¶ 156; Resp. SMF ¶ 156.)   It is

standard police procedure for officers to confer before making an arrest and Officer Hondo

follows that approach nearly always when working the street.  (SMF ¶ 157; Resp. SMF ¶ 157.)

One of the purposes of conferring with another officer about witness statements is to pool

information when making a probable cause determination.  (SMF ¶ 158; Resp. SMF ¶ 158.)

Before deciding to arrest Gelband, Officers Tully and Hondo conferred  in the hallway out of the

hearing of the three parties about what they had learned during their respective interviews and

discussed the circumstances.  (SMF ¶¶ 159, 160; Resp. SMF ¶¶ 159, 160; Pl.'s SMF ¶ 30; Defs.' Resp. SMF ¶ 30.)

According to the defendants, when conferring with Officer Tully, Officer Hondo was trying to determine whether probable cause existed to justify Gelband's arrest and, if so, which offenses were committed.  (SMF ¶ 161; Hondo Dep. at 37:15-22.)  Officers Hondo and Tully compared notes in order to decide on the proper course of action and to ensure that both officers agreed on an approach.  (SMF ¶ 161; Hondo Dep. at 35:22 - 36:8.)  Gelband retorts that Hondo testified that he did not ask a follow-up question because he had not prevented Gelband from answering the question, "What happened?"  (Resp. SMF ¶¶ 161,162; Hondo Dep. at 56.) He testified that it is his practice when arriving at the scene of a brawl to ask everybody "what happened" so as to give everybody a "fair opportunity to say what they saw and what they didn't see," and that once he asked everybody "what happened" he does not ask follow-up questions. (Resp. SMF ¶¶ 161,162; Hondo Dep. at 50-51.)  Hondo further testified and admitted that, because plaintiff was not gagged, asking plaintiff "what happened" accomplished as much as asking nothing at all.  (Resp. SMF ¶¶ 161,162; Hondo Dep. at 56.)  Absent even a meaningful attempt to discover and assess the totality of the circumstances, Gelband insists, Officer Hondo cannot be said to have considered the question of probable cause or proper action which he knows must be based on the totality of the circumstances.  (Resp. SMF ¶¶ 161,162; Hondo Dep. at 57-59.)

Officer Tully told Officer Hondo that Bates and Hilton had reported that Gelband had assaulted them with a telephone.  (SMF ¶ 163; Resp. SMF ¶ 163; Pl.'s SMF ¶ 30; Defs.' Resp. SMF ¶ 30.)  Tully told Hondo that Bates and Hilton wanted to press charges against Gelband and that they had agreed to give written statements.  (SMF ¶ 164; Resp. SMF ¶ 164;

Pl.'s SMF ¶ 30; Defs.' Resp. SMF ¶ 30.)  Hondo told Tully that Gelband had told him that he

was not sure what happened, but that Gelband said that he believed that he may have 'hurt the

girls.'  (SMF ¶ 165; Resp. SMF ¶ 165.)  Gelband's statement to Officer Hondo that he 'may

have hurt the girls' corresponded with Hondo's observations of the visible injuries to Bates and

Hilton, as well as the women's statements to Officers Hondo and Tully that Gelband assaulted

and injured them, which supported probable cause to arrest Gelband.  (SMF ¶ 166; Hondo Dep.

at 69:5-70:16.)  In sum, Officers Tully and Hondo decided to arrest Gelband after assessing the

totality of the circumstances, which included a consideration of the statements made to the

officers by Bates and Hilton, the visible injuries sustained by Bates and Hilton, and statements

made by Gelband.  (SMF ¶ 167; Pl.'s SMF ¶ 33; Defs.' Resp. SMF ¶ 33; Tully Dep. at 13:25 -

14:10; 23:13 -25:7; 26:24 - 27:5; see also Hondo Dep. at 36:9-19.)[17]  Officer Tully concluded

that Gelband was the aggressor after observing the injuries sustained by Bates and Hilton.  (SMF

¶ 168; Resp. SMF ¶ 168.)  Hondo did testify that he did not ask Hilton or Bates whether they had

struck Gelband.  (Hondo Dep. at 66; see also Pl's SMF ¶ 31; Defs.' SMF ¶ 31.)  Officer Hondo

did not mention or refer to Gelband's wounds when conferring with Tully.  (Hondo Dep. at 50;

see also Pl's SMF ¶ 32; Defs.' SMF ¶ 32.)

   According to the defendants, it would have been reasonable for the arresting officers to

believe that Gelband's injuries were sustained as a result of the efforts of Bates and Hilton to

defend themselves against an attack by Gelband.  (SMF ¶ 169; Gelband Dep. at 178:9-15.)

Gelband responds that the arrest was made without any regard whatsoever for the exculpatory

evidence.  (Resp. SMF ¶ 169; Gelband Dep. at  178:9-15.)  He specifically states that Hondo did

not ask the women about Gelband's wounds (Resp. SMF ¶ 169; Hondo Dep. at 66); Officer

---

[17]     Gelband disputes Paragraphs 166 and 167 on the grounds that neither officer considered exculpatory evidence that was in plain sight nor did they conduct a reasonable investigation.  He cites to his memorandum of law.  This is not a factual dispute but an argument concerning what conclusion the court should draw from the facts.

Hondo did not discuss Gelband's wounds with Tully (Resp. SMF ¶ 169; Hondo Dep. at 50);

Officer Hondo stood three or five feet away from the plaintiff while they talked but he did not

notice that Gelband was bleeding from his head (Resp. SMF ¶ 169; Hondo Dep. at 26,29);

Officer Tully did not observe Gelband's injuries (Resp. SMF ¶ 169; Tully Dep. at 27); and

neither Hondo nor Tully reported Gelband's wounds (Resp. SMF ¶ 169; Doc. No. 48-7).

After conferring, Officers Tully and Hondo concluded that there was probable cause to

support Gelband's arrest.  (SMF ¶ 170; Tully Dep.  at 16:2-17; Hondo Dep. at 24:5-6; Pl.'s SMF

¶ 33; Defs.' Resp. SMF ¶ 33.)[18]  Officers Hondo and Tully concluded that it was appropriate to

charge Gelband with aggravated assault because they had evidence that Gelband used a weapon

to cause severe bodily injury to Bates and Hilton, which was evident from their head lacerations

and bleeding.  (SMF ¶171; Tully Dep. at 14:11-17; Hondo Dep. at 73:17- 20; see also Hondo

Dep. at 38:6-15, 39:10-25; 40:1-6.)[19]  A telephone receiver would qualify as a weapon for the

purposes of an aggravated assault charge.  (SMF ¶ 172; Hondo Dep. at 38:16-19.)[20]

Officer Hondo arrested Gelband on November 27, 2007, after which he was transported

to the Cumberland County Jail. (SMF ¶ 173; Resp. SMF ¶ 173; Pl.'s SMF ¶ 33; Defs.' Resp.

SMF ¶ 33.)  Officer Hondo made this arrest based upon information gathered by Officers Hondo

and Tully.  (SMF ¶ 174; Resp. SMF ¶ 174.)  Gelband was charged with two counts of

aggravated assault on November 27, 2007.  (SMF ¶ 175; Resp. SMF ¶ 175.)

---

[18]    To dispute this fact Gelband rehashes an earlier response to facts that I have already accounted for in this recitation.

[19]    Gelband adds that the Maine Medical Center found that the injuries sustained by Bates and Hilton were "superficial." (Resp. SMF ¶171; Defs.'s Exs. 0-11 & 0-12.)  The seriousness of the injury is not an element under the section of the aggravated assault statute implicated by Gelband's conduct.  It is also a bit ironic that in his surreply Gelband insists that it was not necessary for his injuries to be serious in order to justify the officer's further inquiry into his condition. He opines:  "A person grazed by a bullet might suffer only a minor wound.  The victim of a knife attack might sustain only minor cuts.  Almost daily we can see interviews with those bombing victims fortunate enough to escape with only a few cuts, bruises or abrasions."  (Surreply at 2.)

[20]    Gelband observes that the television remote that Hilton allegedly hit him in the head was similarly a weapon.  (Resp. SMF ¶ 172; Gelband Dep. at 37-23-38:16.)

Neither Hondo nor Tully reported Gelband's wounds on the incident report (Pl.'s SMF ¶ 21; Doc. No. 48-7), but the officers arranged for Officer Keller to photograph Gelband, including his injuries, and the photographs were made part of the police file opened by Officer Tully. (Defs.' Resp. SMF ¶¶ 21, 23).  On November 27, 2007, it was the stated policy of the Portland Police Department that incident reports be complete.  (Pl.'s SMF ¶ 22; Defs.' Resp. SMF ¶ 22.) Although Hondo did not report Gelband's wounds, he did report more minor details such as that Gelband smoked a cigarette and agreed to sit down.  (Pl.'s SMF ¶ 23;  Defs.' SMF ¶ 23; Doc. No. 48-7.)  On November 27, 2007, it was the stated policy of the Portland Police Department that officers conduct thorough preliminary investigations at every crime to which they were assigned.  (Pl.'s SMF ¶ 24;  Defs.' SMF ¶ 24.)

Officer Frazier's involvement in the Gelband case was limited to interviewing Hilton at Maine Medical Center after Gelband was arrested on November 27, 2007, and obtaining a signed statement from her.  (SMF ¶ 176; Tully Dep. at 31:1-7, 61:19- 62:4; Gelband Dep. Ex. State-2.)[21] Officer Tully incorporated this statement into his police report.  (SMF ¶ 177; Tully Dep. at 31:8-24; 42:12-15; Gelband Dep. Ex. State-2.)[22]

**Non-Cooperation of Ms. Bates and Ms. Hilton**

There is no dispute that a grand jury sitting in Cumberland County indicted Mr. Gelband on two counts of aggravated assault on Bates and Hilton.  (SMF ¶ 178; Resp. SMF ¶ 178.) However, Bates and Hilton stopped cooperating with the police after they testified in the grand jury about the November 27, 2007, incident.  (SMF ¶ 179; Resp. SMF ¶ 179.)  The indictment against Gelband was ultimately dismissed.  (SMF ¶ 180; Resp. SMF ¶ 180.)

---

[21]     Gelband's response to this statement is to insist that Frazier assisted Tully with fabricating a motive.  (Resp. SMF ¶ 176.)  He offers no record citation in support of this conjecture.

[22]     Gelband contends that the incorporated statement was fabricated by Frazier.  (Resp. SMF ¶ 177; Gelband Dep. at 192:4-7.)

### *Recommended Resolution*

As addressed in my recommended decision on the motions to dismiss: "'Proof of probable cause is not to be confused with the more onerous standard of proof of guilt beyond a reasonable doubt.'" Gelband, 2009 WL 1686832 at 2 (quoting Morelli v. Webster, 552 F.3d 12, 21 (1st Cir.2009)).  In that decision I noted Gelband's heavy reliance on Kuehl v. Burtis, 173 F.3d 646 (8th Cir.1999) in which the Eighth Circuit stated:  "An officer contemplating an arrest is not free to disregard plainly exculpatory evidence, even if substantial inculpatory evidence (standing by itself) suggests that probable cause exists."  173 F.3d at 650 (citing Bigford v. Taylor, 834 F.2d 1213, 1218 (5th Cir.)).  Kuehl also stressed that "law enforcement officers have a duty to conduct a reasonably thorough investigation prior to arresting a suspect, at least in the absence of exigent circumstances and so long as 'law enforcement would not [be] unduly hampered ... if the agents ... wait[ ] to obtain more facts before seeking to arrest.'"  Id. (quoting United States v. Woolbright, 831 F.2d 1390, 1394 (8th Cir.1987)). While noting that "[a]n officer need not conduct a 'mini-trial' before making an arrest," id. (citing Brodnicki v. City of Omaha, 75 F.3d 1261, 1264 (8th Cir.) and Morrison v. United States, 491 F.2d 344, 346 (8th Cir.1974)), the Panel cautioned that "probable cause does not exist when a 'minimal further investigation' would have exonerated the suspect."  Id. (quoting Bigford, 834 F.2d at 1219) (string citation omitted).

While Gelband survived the motion to dismiss while relying on the failure to investigate discussion of Kuehl, he has not met his summary judgment burden.  The undisputed facts material to the probable cause inquiry do not place in genuine dispute the conclusion that "the facts and circumstances within" Hondo's and Tully's "knowledge and of which [they] had reasonably trustworthy information were sufficient to warrant ... prudent [officers] in believing

that" Gelband had committed aggravated assault.  Rivera v. Murphy, 979 F.2d 259, 263 (1st Cir.

1992).

After all the effort by the parties and this court in working up and sifting through this

factual record, it is evident to me that the resolution of this Fourth Amendment dispute is straight

forward.  Tully, Hondo, and Frazier are entitled to judgment as a matter of law on their motions

for summary judgment and Gelband's motion for partial summary judgment must be denied.  In

his memorandum in support of his motion for summary judgment and his surreply to the

defendants' motions  Gelband's most persistent argument is that Tully and Hondo did not

sufficiently investigate his injuries when they made the determination that they had probable

cause to arrest Gelband for the injuries to Hilton and Bates which Gelband does not dispute he

caused.  At best this an argument that the officers might have had grounds to also charge Hilton

and/or Bates with an assault on Gelband.  This possibility does not defeat the officers' case that

they had  probable cause to arrest Gelband.  Obviously brawl or (to use Gelband's phrasing)

"fracas" situations can potentially result in arrests of more than one of the participants in the

fray; it is not a question of only being able to choose one person to arrest.  Gelband does not

dispute that he at no time requested that the officers charge Hilton and/or Bates, whereas both

women requested that they charge Gelband.  Gelband does not contest that he was responsible,

by using a telephone as a weapon, for the injuries sustained by Bates and Hilton, both of whom

required treatment, including stitches.  Gelband's theory is that he acted in self-defense and that

the officers did not sufficiently press him to explain this defense.  However, as Kuehl observes,

Hondo and Tully were not in a position to hold a "mini-trial" before they made the decision to

arrest Gelband, see also Logue, 103 F.3d at 1044 ("[T]hough probable cause requires more than

mere suspicion, it does not require the same quantum of proof as is needed to convict."), and it

would have been entirely inappropriate had they done so.  Furthermore, this record clearly does not present the court with a factual conundrum vis-à-vis what these individual officers may have known prior to arriving to the scene that may have cut against their probable cause determination.  See Prokey, 942 F.2d at 73.[23]

Finally, I add that should the court reject this recommendation as it relates to Gelband's claims against Hondo and Tully, there can be no question that Frazier is entitled to judgment at this juncture.  The assertions that Gelband makes about Fraizer's fabrication are entirely unsupported by any record evidence and rely solely on Gelband's conjecture.  Furthermore, Frazier's involvement was indisputably after Hondo arrested Gelband so it has no relevance to the Fourth Amendment warrantless arrest inquiry.

## CONCLUSION

For these reasons, I recommend that the Court grant the summary judgment motions filed by Hondo (Doc. No. 49), Tully (Doc. No. 50) and Frazier (Doc. No. 51) and deny Gelband's motion for partial summary judgment against Officers Hondo and Tully (Doc. No. 66).

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within fourteen (14) days of being served with a copy thereof.  A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.

---

[23]   As set forth in footnote 3, the defendants did venture into some pre-incident facts pertaining to Gelband's, Hilton's, and Bates's previous experience with law enforcement but I have not relied on those facts in reaching my conclusion and, if I had, it would have only been to Gelband's disadvantage.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

April 23, 2010